IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO
_____

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

v.                                                      Cr. No. 99-164 JP

**AUREO LUIS RONQUILLO and
ARMANDO PALOMINO,**

        **Defendants.**

## MEMORANDUM OPINION AND ORDER

On May 3, 1999, Defendant Aurelio Luis Ronquillo filed his motion to suppress evidence found as a result of a search of his home at 7880 Windsong Street SW in Albuquerque, New Mexico. Defendant argues that the search violated the Fourth Amendment because consent to search the home was involuntarily given by his wife, Gladys Ronquillo.[1] On May 27, 1999, a

---

[1] At the May 27, 1999 hearing, counsel for the United States argued that, while Defendant Ronquillo does have a reasonable expectation of privacy in his home, he does not have a right to suppress evidence obtained as a result of unconstitutionally coercive police conduct directed at his wife. Transcript of Hearing held May 27, 1999 at 14-15. However, this argument is without support in the law. Countless cases, both in the Tenth Circuit and in other jurisdictions, have examined the issue of whether consent to search was given voluntarily by a third party authorized to grant such consent. See, e.g., United States v. Waupekenay, 973 F.2d 1533, 1536 (10th Cir. 1992); Lenz v. Winburn, 51 F.3d 1540, 1548-49 (11th Cir. 1995); United States v. Evans, 27 F3d 1219, 1230-31 (7th Cir. 1994). Implicit in these cases is the understanding that involuntary consent to search given by a third party renders a search illegal, and that any evidence obtained as a result of that search cannot be admitted at trial against a defendant with a legitimate privacy interest in the premises searched. If the Government's argument were to stand, it would never be necessary to determine the voluntariness of consent given by third parties. The cases cited by the United States, including United States v. Payner, 447 U.S. 727, 731-32 (1980) and United States v. Gonzales (and Delatorre, et. al), 164 F.3d 1285, 1289 (10th Cir. 1999), do not change this outcome.

hearing on the motion was held at which three witnesses testified[2] and two exhibits were admitted into evidence. After a careful review of the evidence, the law, and the briefs, I conclude that the motion should be granted.

### Findings of Fact

On January 22, 1999, Artemio Cantu, a Special Agent with the Drug Enforcement Administration, arrested the Defendants for selling drugs at the Flying J Truck Stop in Albuquerque. Agent Cantu and other law enforcement officers believed that more contraband might be hidden in Ronquillo's[3] home. However, the agents did not know where Ronquillo lived. In an effort to get this information, the agents went to the home of co-defendant Armando Palomino on 98th Street NW in Albuquerque.[4]

Agent Cantu, Agent Kendall Johnson, and state police officers Miguel Mendez and Rudy Mora arrived at the Palomino residence between 7:30 and 8:00 p.m. on January 22, 1999. Defendant Palomino's fifteen year old daughter Julianna answered the door and let the four officers into the home. Rita Palomino, Defendant Palomino's wife, then came out of a bedroom and into the front room of the house. Agent Cantu spoke with Rita Palomino in Spanish, informed her that he was a DEA agent, and told her that her husband had been arrested for selling narcotics.

---

[2]Agent Artemio Cantu, Gladys Ronquillo, and Rita Palomino testified at the hearing. Because parts of the testimony of both Agent Cantu and Gladys Ronquillo seemed questionable, the Findings of Fact set forth below are not completely in accord with the testimony of either witness.

[3]At this time, law enforcement officers believed that Defendant Ronquillo's name was Eric Duran.

[4]Defendant Armando Palomino is the father of Gladys Ronquillo and the father-in-law of co-defendant Aureo Luis Ronquillo. Rita Palomino is the wife of Armando Palomino, the mother of Gladys Ronquillo, and the mother-in-law of co-defendant Aureo Luis Ronquillo.

Rita Palomino was shocked and emotional. Agent Cantu then asked Rita Palomino if she knew where Eric Duran's wife was. Rita Palomino said that Duran's wife was out with a friend but would be returning to the house in ten or fifteen minutes. Agent Cantu and the other officers waited in the Palomino residence for about fifteen minutes. During this time Agent Cantu, a native Spanish speaker, talked with Rita Palomino in Spanish. Both Agent Cantu and Agent Johnson were carrying concealed firearms, but Rita Palomino did not see the weapons.

About twenty to thirty minutes after the four law enforcement officers entered the house, Gladys Ronquillo arrived at the Palomino residence. She had been buying milk for her four month old daughter. Gladys Ronquillo arrived with her sister Jacquelyn and a relative, Rosario Garcia, who had driven her to the store. While the law enforcement officers searched Rosario Garcia and his truck, Gladys Ronquillo entered the home. Agent Cantu introduced himself to Gladys Ronquillo in Spanish and told Gladys Ronquillo that her husband (Defendant Ronquillo) and father (Defendant Palomino) had been arrested for selling narcotics. Agent Cantu explained that he suspected that there might be more drugs at Gladys Ronquillo's home and asked for permission to search it for drugs. Gladys Ronquillo was frightened, shocked and alarmed by this news. Agent Cantu said he needed Gladys Ronquillo to open her house for him, warning her that if she refused, "It won't go well with you." Gladys Ronquillo said several times that she was in very bad condition, that she did not want to open the house, and that it could be done the next day.[5] Agent Cantu responded that he didn't work on Saturdays because he needed to rest. Agent Cantu insisted that if Gladys Ronquillo did not open her house, things would go badly for her. Gladys Ronquillo then gave Agent Cantu permission to search her residence. Gladys Ronquillo asked if her mother

---

[5]January 22, 1999 was a Friday.

3

(Rita Palomino) could accompany her to her home.  Agent Cantu said that would be fine.  Agent Cantu and Gladys Ronquillo agreed that he and the other law enforcement officers would follow her to the house.  Before leaving the Palomino residence, Gladys Ronquillo also told Agent Cantu that she had locked her keys inside her house and therefore could not unlock the door.

Gladys Ronquillo and Rita Palomino drove to the Ronquillo residence, located at 7880 Windsong, in their own car; no law enforcement agents rode in the car with them.   Agent Cantu and the other agents followed in separate vehicles.  At some point, state police officers Miguel Mendez and Rudy Mora were separated from the others.  However, Agents Cantu and Johnson followed Gladys Ronquillo and Rita Palomino to 7880 Windsong.  Upon their arrival at the house, Gladys Ronquillo opened up the outer, wrought-iron security door but the agents were unable to open the inner front door because Gladys Ronquillo did not have the key.  Agent Johnson radioed Officers Mendez and Mora, asking them to retrieve the keys that had been taken from "Eric Duran" when he had been processed at the jail.  The group waited approximately twenty five minutes for Officers Mendez and Mora to arrive with the keys.  During that time, Gladys Ronquillo and Rita Palomino waited in their car.  Agent Cantu remained standing outside the house.

The two state police officers arrived with the keys and a canine, which stayed in the police car initially. Without specifically requesting permission to do so, Agent Cantu used one of the keys to open the door to the residence at 7880 Windsong.  After they entered the home, Agent Cantu informed Gladys Ronquillo that they had a drug sniffing canine available, the use of which would expedite the search.  At this point, the dog was out of sight in a nearby police car.  Gladys Ronquillo told Agent Cantu that she was afraid of dogs and asked "Can't you guys do the search?"  Agent Cantu told Gladys Ronquillo that the men could do the search, but that using the dog would

expedite the process. Agent Cantu told Gladys Ronquillo that he would wait with her while the dog was searching the house so that she would not be afraid. Ultimately, Gladys Ronquillo gave Cantu consent to use the dog. Agent Cantu waited in the living room with Gladys Ronquillo and Rita Palomino while Officer Mora searched the house with the dog. About ten minutes after the search began, Agent Cantu left the two women when Officer Mora indicated that the dog had alerted in the garage. Agent Cantu then helped in the search of the garage, where narcotics and other contraband were found, and Officer Mendez waited in the living room with Gladys Ronquillo and Rita Palomino for the remainder of the search. The law enforcement officers seized the contraband, along with various documents and Gladys Ronquillo's house keys. During the search, which lasted a couple of hours, Gladys Ronquillo's sister called to tell Gladys that her four month old daughter was crying because she was hungry. Gladys Ronquillo told the officers about the call, but they said that she could not leave the house to care for her daughter.

On January 22, 1999, Gladys Ronquillo was 21 years old. She had completed junior high school in Mexico, and had received her General Equivalency Degree in the United States. She has taken classes in English and has received some training at the Technical-Vocational Institute (TVI). She has been employed as a cosmetologist for the past three years. All of Gladys Ronquillo's conversations with Agent Cantu were conducted in Spanish, Gladys Ronquillo's native language, and she did not have any difficulty understanding what he said.

## Analysis

The voluntariness of Gladys Ronquillo's consent to the search of her home must be determined by considering the totality of the circumstances, with the government bearing the burden of proof. See United States v. Soto, 988 F.2d 1548, 1555 (10th Cir. 1993); United States

v. Nicholson, 983 F.2d 983, 988 (10th Cir.1993); United States v. Price, 925 F.2d 1268, 1271 (10th Cir. 1991). "[T]he government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." United States v. Zapata, 997 F.2d 751, 758 (10th Cir. 1993) (quoting Nicholson, 983 F.2d at 988).

Knowledge of the right to refuse to consent is but one factor in evaluating voluntariness under the totality of the circumstances test. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). Other factors to consider include the age, intelligence, education, and language ability of the person giving consent, see Schneckloth, 412 U.S. at 226; United States v. Mendenhall, 446 U.S. 544, 558 (1980); United States v. Carrate, 122 F.3d 666, 670 (8th Cir. 1997); the degree to which she cooperates with the police, see United States v. Glover, 104 F.3d 1570, 1584 (10th Cir. 1997); United States v. Rosi, 27 F.3d 409, 412 (9th Cir. 1994); her attitude about the likelihood of the discovery of the contraband, see United States v. Asibor, 109 F.3d 1023, 1039 (5th Cir. 1997); United States v. Williams, 951 F.2d 853, 856-57 (7th Cir. 1992); the length of detention and the nature of the questioning, including the use of physical punishment, see Schneckloth, 412 U.S. at 226; United States v. Orrego-Fernandez, 78 F.3d 1497, 1505 (10th Cir. 1996); and other coercive police behavior, see United States v. Waupekenay, 973 F.2d 1533, 1536 (10th Cir. 1992) (finding that consent to search given by defendant's wife was not voluntary when officers warned her that she would go to jail if she did not cooperate and the officers drew their weapons); United States v. Mendoza-Salgado, 964 F.2d 993, 1012 (10th Cir. 1992).

No single factor is dispositive. Schneckloth, 412 U.S. at 226-27. Furthermore, the issue of whether consent was voluntary is a question of fact that will be upheld on appeal unless the lower

court's finding is clearly erroneous. See United States v. Orrego-Ferenandez, 78 F.3d 1497, 1505 (10th Cir. 1996); United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994).

### *(1) Knowledge of the Right to Consent*

There is no evidence in the record that Gladys Ronquillo knew that she had the right to refuse to allow Agent Cantu and the other law enforcement officers to search her home.[6] While not dispositive, the lack of knowledge of the right to refuse consent is a "factor particularly worth noting" under the totality of the circumstances test. United States v. Fernandez, 18 F.3d 874, 882 (10th Cir. 1994) (quoting Florida v. Bostick, 501 U.S. 429, 431, 111 S.Ct. 2382, 2385 (1991)).

### *(2) Age, Intelligence, Education, Language Ability, and Emotional Condition*

At the time of the search, Gladys Ronquillo was legally an adult. She went to junior high school in Mexico, and after she came to the United States she took classes at TVI and received her General Equivalency Degree; she appears to be of average or above-average intelligence. She has taken some classes in English. This case does not present the issue of whether Gladys Ronquillo was unable to understand Agent Cantu due to a language barrier because Agent Cantu spoke to her

---

[6] During the hearing, Defendant Ronquillo's counsel had the following exchange with Gladys Ronquillo:
    Q.    Mrs. Ronquillo, did you feel you were free to leave at any time after arriving at your house on Windsong with the police officers?
    A.    Yes.
    Q.    Did you feel you were free to say---to refuse to take the police officers from your mom's house to your house?
    A.    Yes.
Transcript of Hearing held May 27, 1999 ("Transcript") at 97, lines 7-10. While this testimony appears damning on paper, it was clear to me at the time of the hearing that Gladys Ronquillo did not understand the questions asked by her husband's attorney. Furthermore, her responses make no sense in light of the rest of her testimony, in which she stated that she led the police officers to her home because of the threats made against her by Agent Cantu and that she could not leave her home at 7880 Windsong even after a phone call informing her that her baby was hungry. Consequently, I have disregarded this testimony.

7

in Spanish, her primary language. Transcript at 95-96.

On the other hand, the mental and emotional state of Gladys Ronquillo at the time she gave Agent Cantu consent to search her home is of concern. Gladys Ronquillo testified that when Agent Cantu told her that he had arrested the Defendants and that he wanted to search her home for drugs, she was scared. Transcript at 67. She testified, "I didn't want to know any more about anything. I wanted to lie down and be with my daughter." Id. Agent Cantu also acknowledged that Gladys Ronquillo was surprised, alarmed and emotional at hearing of her husband's and father's arrests. Transcript at 28, 48. The Government failed to present evidence regarding the length of time that had elapsed between the time that Agent Cantu informed Gladys Ronquillo that her husband and father had been arrested and the time that Agent Cantu gained her consent. There is also no evidence that indicates that Gladys Ronquillo had gained control of her emotions by the time she gave consent. Under these circumstances, it is questionable whether Gladys Ronquillo could have given effective consent in her agitated and emotional condition.

### *(3)    Cooperation with the Law Enforcement Officers*

Gladys Ronquillo cooperated with the law enforcement officers at various times during the evening of January 22, 1999. However, Gladys Ronquillo cooperated with Agent Cantu and the others only after Agent Cantu repeatedly insisted that she allow him to search the house. See Part (5), infra. Gladys Ronquillo led the officers, who did not know her address, to her home at 7880 Windsong Street. Once they reached the house, Gladys Ronquillo attempted to open the door. She opened the outer, wrought-iron security door for the officers, and then waited in the car outside the home while officers Mendez and Mora were retrieving the keys that had been taken from her husband. However, when officers Mendez and Mora arrived with the keys, Agent

8

Cantu—not Gladys Ronquillo—opened the inner door to the house.

### *(4)  Attitude about the Likelihood of the Discovery of the Contraband*

Gladys Ronquillo testified that she did not know that there were drugs, guns, or large sums of money in her house. Transcript at 75-76. Consequently, she would have no particular motive to deny Agent Cantu consent to search her home.[7]

### *(5)  Length of Detention[8], Nature of the Questioning and Other Coercive Police Behavior*

Gladys Ronquillo testified that when she arrived at her mother's house, the law enforcement officers identified themselves and the purpose of their visit. Transcript at 83-84. The four men did not brandish any weapons or touch Gladys Ronquillo. Id. at 84.

However, there were a total of four law enforcement officers present while Agent Cantu was persuading Gladys Ronquillo to permit him to search her home. In United States v. Davis, 40 F.3d 1069, 1078 (10th Cir. 1994), the Tenth Circuit recognized that the presence of several officers in one's "home might be intimidating to the point of negating the voluntariness of consent in some situations." See also United States v. Winningham, 140 F.3d 1328, 1332 (10th Cir. 1998). In this case, Gladys Ronquillo reasonably could have felt overwhelmed by the presence of four law enforcement officers in the home, despite the fact that several of her family members were also present.

---

[7] At the hearing, counsel for Defendant Ronquillo stated that Gladys Ronquillo was aware that the house contained forged immigration documents bearing her husband's alias. Transcript at 77. However, Gladys Ronquillo herself did not testify to that fact.

[8] It is unclear from the record how long Agent Cantu spoke with Gladys Ronquillo at the Palomino residence before gaining consent to search her home. Consequently, I do not address that factor here.

In their analysis of the validity of consent, courts often point to the fact that the encounter with the police took place in a busy, public place as an indicia that consent was voluntarily given. See, e.g., United States v. Orrego-Ferenandez, 78 F.3d 1497, 1505 (10th Cir. 1996); United States v. Lattimore, 87 F.3d 647, 651 (4th Cir. 1996). However, that indicia is absent in this case, where the confrontation between Agent Cantu and Gladys Ronquillo took place in Rita Palomino's living room, not in a public place.

Most importantly, Agent Cantu made an implied threat against Gladys Ronquillo when he told her that it would "go badly" for her if she did not open up the house for him. Transcript at 68, 69, 72-73, 79, 80, 81. Gladys Ronquillo interpreted this to mean that if she did not cooperate with Agent Cantu, he would take her to jail. Id. at 80, 81. Rita Palomino evidently interpreted the statement the same way. Id. at 109, 116. In addition, Agent Cantu persisted in asking Gladys Ronquillo to open up her house even after she stated that she did not feel well and that the search could take place the next day instead. Transcript at 68-69, 109.

The Government might argue that any perceived threat in Agent Cantu's words originated in Gladys Ronquillo's and Rita Palomino's imaginations. However, an objectively reasonable person would have perceived a threat in Cantu's statement that it would "go badly" for Gladys Ronquillo if she did not permit the search. Furthermore, when examining the totality of the circumstances to determine "if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." Schneckloth, 412 U.S. at 229, 93 S.Ct. at 2049. In this case, Agent Cantu's statements were more than subtly coercive. The Tenth Circuit has stated, "[T]he test is not whether a reasonable person would have felt coerced, but whether the consenting party felt coerced

under the existing circumstances." United States v. Mendoza-Salgado, 964 F.2d 993, 1011 n. 9 (10th Cir. 1992). In this case, Gladys Ronquillo testified that she felt coerced by Agent Cantu's implied threat.

## Conclusion

In balancing all of the factors outlined above, I conclude that Gladys Ronquillo involuntarily gave Agent Cantu consent to search her home. While it is true that Gladys Ronquillo cooperated with the law enforcement officers by leading them to her home, and that she would have no motive to deny consent because she had no knowledge that the house contained drugs, money, and weapons, these factors are outweighed by several other considerations. Gladys Ronquillo had no knowledge of her right to refuse consent and she was very upset and emotional at the time she granted consent. Most importantly, Gladys Ronquillo acquiesced only after she was pressured by Agent Cantu's insistent, repeated requests to search and vague threats against her in the presence of three other law enforcement officers. These actions rendered Gladys Ronquillo's consent involuntary. Although none of these factors would, by itself, raise doubt regarding Gladys Ronquillo's consent, given the totality of the circumstances, I conclude that the government has failed to show, as it must, that Gladys Ronquillo's consent was obtained without duress or coercion, express or implied. United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992). Consequently, Defendant Ronquillo's motion to suppress should be granted.

IT IS THEREFORE ORDERED that Defendant Ronquillo's motion to suppress (Doc. No. 39) is GRANTED and all evidence found as a result of the search of 7880 Windsong SW is hereby suppressed.

_/s/ James A. Parker_
**UNITED STATES DISTRICT JUDGE**